# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1919V

| | |
|---|---|
| JAMES PATTERSON, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: October 2, 2023 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Rachelle Bishop, U.S. Department of Justice, Washington, DC, for Respondent.*

## FINDINGS OF FACT[1]

On December 21, 2020, James Patterson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that on November 19, 2019, he received an influenza ("flu") vaccine in his left arm and a hepatitis A ("hep A") vaccine in his right arm – both covered vaccines in the Program – and thereafter sustained **two** shoulder injuries related to vaccine administration ("SIRVAs"), or in the alternative, the significant aggravation of preexisting injuries. Petition, ECF No. 1; Amended Petition, ECF No. 19. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find that the hep A vaccine was most likely administered in Petitioner's right arm, as alleged (with it undisputed the flu vaccine was administered in his left arm). But there remain some other fact matters to resolve, and certain aspects of the case, as discussed herein, suggest exploration of settlement would be wise.

## I. Relevant Procedural History

Petitioner filed the supporting medical records and his sworn declaration in November 2021.[3] Exs. 1-10, ECF No. 12. The case was assigned to SPU in February 2022. ECF No. 15. In June 2022, Petitioner filed additional medical records and his wife's sworn declaration. Exs. 11 – 13, ECF No. 20.[4]

On June 26, 2023, Respondent filed his Rule 4(c) Report opposing compensation for a Table and/or off-Table claim for several reasons, including that the contemporaneous medical record indicated that the hep A vaccine had been administered in Petitioner's *left* deltoid. Rule 4(c) Report at 10 – 17. The situs issue is now ripe for adjudication.

## II. Applicable Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule

---

[3] While Petitioner and his wife's statements (Exs. 10, 13) are not notarized, they are signed under penalty of perjury pursuant to 28 U.S.C.A. § 1746.

[4] Petitioner did not include these pre-vaccination medical providers on his PAR Questionnaire, ECF No. 13.

2

does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical

records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### III. Finding of Fact

I have reviewed the record to include all medical records, affidavits, documentation, briefing, and additional evidence filed. Summarized below is the evidence most pertinent to my factual finding regarding the situs dispute (as well as my preliminary reaction to other issues in the case).

- Petitioner was born in 1963. He went to the Carilion Clinic for primary care including the management of obesity, kidney disease, and hypertension. *See, e.g.*, Ex. 6 at 40-43.

- From February 27 – March 6, 2019, Petitioner attended five treatment sessions at the Wilson Chiropractic Clinic for low back and neck pain. Ex. 11.

- On October 1, 2019, Petitioner presented to Balance Wellspace Integrative Care to address chronic pain in his bilateral shoulders, neck, low back, and right knee. He reported dislocating both shoulders while playing college football and rugby 30 years earlier, and receiving chiropractic treatment (for his low back and neck see above) following a motor vehicle accident in January 2019.[5] The exam findings included bilateral shoulder tenderness, muscle tightness, and reduced range of motion. Ex. 12 at 2 – 26, 31 – 33. X-rays found degenerative disease in both shoulders, particularly in the AC joint space. *Id.* at 45 – 46.[6] He was assessed with bilateral shoulder pain, back pain, right knee pain, myalgia, cervicalgia, segmental and somatic dysfunction. *Id.* at 32, 34.

- Petitioner returned to Balance Wellspace for chiropractic manipulation, electronic muscle stimulation, and stretching – without any documented improvement in symptoms – on November 7, 12, and 18, 2019. Ex. 12 at 35 – 40.

- On November 19, 2019, Petitioner presented to his primary care physician for his annual evaluation. Ex. 2 at 40-48. The physician recorded, in the context of discussing Petitioner's increasing obesity: "His activity has been limited by some joint and muscle pains. He is working with a chiropractor and physical therapist on

---

[5] No contemporaneous documentation, such as emergency room or urgent care encounters, of the motor vehicle accident have been filed.

[6] Additional imaging was taken of the cervical and lumbar spine, and the right knee. *Id.* at 43-44, 47.

4

this presently." *Id.* at 41.[7] The review of systems and exam do not address the shoulders or the musculoskeletal system. *Id.* at 43-44. The physician ordered flu and hep A vaccines. Ex. 2 at 41, 48. A nurse administered both vaccines – both in Petitioner's left deltoid, according to the electronic medical record. *Id.* at 47. Of note, the vaccine administration records were "**never marked as reviewed**." *Id.* (emphasis added).

- On November 20, 2019, Petitioner returned to Balance Wellspace for his fourth treatment session. The record does not reference the previous day's vaccinations or any change in his condition. Ex. 12 at 41-42.

- Twenty (20) days post-vaccination, on December 9, 2019, Petitioner returned to his primary care practice. Ex. 2 at 29-39. The evaluation was conducted by a resident, then reviewed by his regular physician. *Id.* at 29. Petitioner reported bilateral shoulder pain which "started after [he] received hep A and flu vaccines **in both deltoids** about 1 month ago." *Id.* at 31 (emphasis added). He disclosed a history of shoulder dislocations. *Id.* He had tried conservative measures but could not sleep at night. *Id.* The physical exam findings included slightly increased hypertrophy on the left side; bilateral deltoid tenderness; pain while exhibiting full range of motion; and pain with a Hawkins test. *Id.* at 34. X-ray findings were indicative of arthritis in both shoulders. *Id.* at 19, 21. The resident's differential diagnosis included rotator cuff tear(s), bursitis, and muscle soreness and spasms due to the vaccinations. *Id.* There was no evidence of frozen shoulder or radicular symptoms. *Id.* Petitioner was prescribed Flexeril (cyclobenzaprine); cautioned against NSAIDs in light of his kidney disease; and instructed on stretches. *Id.*

- On December 10, 2019, the primary care resident advised: "It is possible that **both vaccines were given too superiorly** and caused a bursitis." Ex. 9 at 38 (emphasis added). She prescribed oral prednisone. *Id.* at 41.

- On December 18, 2019, the primary care nurse documented Petitioner's report of ongoing bilateral shoulder pain. Ex. 9 at 29. The nurse consulted with the resident, who suggested another appointment. *Id.*

- During a December 24, 2019, appointment, the primary care physician recorded Petitioner's history of an "acute onset of bilateral shoulder pain… which he temporally attribute[d]… to receiv[ing] **bilateral shots** at his visit on November 19."

---

[7] As noted below, Petitioner has not conclusively addressed the potential for outstanding physical therapy records.

Ex. 2 at 14 (emphasis added). The pain had been quite severe but was treated effectively with prednisone. *Id.* He was concerned about taking NSAIDs long-term in light of his kidney disease. *Id.* at 14-15. On exam, Petitioner was unable to raise either arm above 90 degrees, and he was "obviously in significant pain." *Id.* at 18. The physician prescribed Mobic (meloxicam) and planned an MRI of the right shoulder (noted to be Petitioner's dominant side) to guide further treatment. *Id.*

- On December 30, 2019, at the Carilion Clinic – Roanoke Memorial Hospital, Petitioner underwent an MRI of the right shoulder, which found: "1. moderate AC osteoarthrosis with undersurface osteophytes which could contribute to rotator cuff impingement; 2. mild subacromial bursitis; 3. mild supraspinatus bursal surface tendon fraying but no evidence of a full-thickness rotator cuff tendon tear; 4. superior glenoid labral tear." Ex. 2 at 12.

- At a January 28, 2020, initial evaluation, an orthopedist recorded Petitioner's history of bilateral shoulder pain beginning within 48 hours of "**bilateral vaccinations**" which were administered on 11/19/2019. Ex. 5 at 10 (emphasis added). Petitioner disclaimed any connection to his pre-vaccination chronic pain and chiropractic treatment. *Id.* He "wonder[ed] if his problem could be a vaccine-related injury." *Id.* After reviewing an MRI report and conducting an exam, the orthopedist offered a differential diagnosis of subacromial bursitis, Parsonage-Turner syndrome, and/or "SILVA." *Id.* at 11-12. He provided bilateral bursa steroid injections and recommended physical therapy ("PT"). *Id.* at 12.[8]

- On March 3, 2020, upon presenting to a new primary care practice, Petitioner reported "a bad reaction to vaccines," and the development of bilateral shoulder bursitis. Ex. 8 at 3-5.

- At the March 18, 2020, PT initial evaluation at Lucas Therapies, Petitioner reported "**bilateral shoulder dysfunction after shots for immunization and the flu… on 11/19/2019**." Ex. 3 at 11 (emphasis added). He "awoke 48 hours later with complete inability to move his shoulders." *Id.* He acknowledged prior shoulder dislocations in association with football and rugby, and "no other contributory past medical [or] past surgical history." *Id.* After reviewing the treatment course to date and conducting a physical exam, the therapist assessed bilateral bursitis; right-

---

[8] Petitioner followed up with the orthopedist on March 12 and May 4, 2020. Ex. 5 at 2-8. After a thirteen-month gap in any medical treatment, he returned to the orthopedist on June 14 and July 1, 2021. Ex. 7 at 1-11. These records do not supplement or contradict the evidence summarized above, with regard to situs – although they are relevant to additional issues in the case, as discussed below.

sided bicipital tendinitis; disuse atrophy; scapular instability; and possible underlying cuff issues. *Id.* at 11 – 12 (noting that the assessment was incomplete and lacked review of his MRI). The therapist recommended formal PT "once a week for several weeks to develop a strengthening program to accomplish [Petitioner's] goals of return to the gym and full use of his shoulders." *Id.* at 12.[9]

- Petitioner and his wife both attest that the flu vaccine was administered in his left arm, followed by the hep A vaccine in his right arm. Exs. 10, 13.

Respondent argues that Petitioner cannot establish a right-sided hep A vaccine administration because the contemporaneous record indicates the *left* deltoid. Rule 4(c) Report at 10, citing Ex. 2 at 47-48. A contrary finding, Respondent contends, cannot be made on Petitioner's claims alone, and his wife's statements about the topic should not be afforded probative value. Rule 4(c) at 10 and n. 8.

"Medical records, in general, warrant consideration as trustworthy evidence . . . [as they] contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions." *Cucuras*, 993 F.2d at 1528. But based upon my experience resolving SPU SIRVA cases (over 1,300 cases since my appointment as Chief Special Master) as well as additional SIRVA cases handled in chambers, it is not unusual for the information regarding site of vaccination in computerized systems to be incorrect. Many of these systems use a "dropdown" menu to enter information, and the relevant fields are often not updated each time a separate vaccine is administered to a different individual. *See, e.g., Mezzacapo v. Sec'y of Health & Hum. Servs.,* No. 18-1977V, 2021 WL 1940435, at *6 (Fed. Cl. Spec. Mstr. Apr. 19, 2021); *Desai v. Sec'y of Health & Hum. Servs.*, No 14-0811V, 2020 WL 4919777, at *14 (Fed. Cl. Spec. Mstr. July 30, 2020); *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020); *Stoliker v. Sec'y of Health & Hum Servs.*, No. 17-0990V, 2018 WL 6718629, at *4 (Fed. Cl. Spec. Mstr. Nov. 9, 2018). This case similarly involves *computerized* vaccine administration records, which would be susceptible to such errors. Additionally in past cases, medical providers have attested to a practice of utilizing both shoulders when administering more than one vaccine. *Rodgers,* 2020 WL 1870268, at *4-5.

Here, Petitioner received two vaccinations on the same day – and he recalled receiving one in each arm. Ex. 10 at ¶ 2. The sole record to contradict this contention is the vaccine administration record. But although it indicates that the left deltoid was utilized

---

[9] While Petitioner returned for a second PT session on March 25, 2020, the record does not include additional information relevant to my situs determination.

7

twice on the same day, this document was "never reviewed" by the primary care providers – even after encountering Petitioner for his post-vaccination complaints. Ex. 2 at 47.[10] Thus, the record itself allows for the possibility that it is incorrect.

Moreover, the witness statements about onset are not without corroboration. In a number of the contemporaneous records, Petitioner reported a history of bilateral vaccinations beginning just 20 days later, and consistently did so to at least five different medical providers. While these entries were based upon information provided by Petitioner, they still deserve weight, especially since they were generated in connection with his efforts to obtain medical care.[11]

Thus, the record in this case preponderates in favor of the conclusion that the hep A vaccine was more likely than not administered in Petitioner's right arm, as alleged.

## IV. Further Analysis

### A. Potentially Outstanding Records

It appears that in January 2020, an orthopedist made a typographical error suggesting the existence of an MRI from "12/9/2010." Ex. 5 at 12. The orthopedist went on to review an MRI report with findings that seem very consistent with those from a December 30, 2019, MRI report pertaining to the right shoulder. *Compare* Ex. 5 at 10-12; Ex. 2 at 12. At a subsequent visit, the orthopedist recorded that he had reviewed the December 2019 MRI. Ex. 7 at 9. But it appears that at least some MRI reports remain unfiled, which Petitioner must address. *See* Rule 4(c) Report at n. 1, 4.

Petitioner must also satisfy Respondent's renewed request for potentially outstanding PT records. Rule 4(c) Report at n. 3. While Respondent's previous request for such records prompted Petitioner's filing of Exs. 11 – 12, those medical records are of chiropractic care, which leaves open the question of pre-vaccination PT from other provider(s).

---

[10] There is also no evidence that Petitioner was aware of the site notation within his primary care provider's electronic medical records during his active treatment course.

[11] The Federal Circuit has stated that "[m]edical records, in general, warrant consideration as trustworthy evidence . . . [as they] contain information supplied **to** or by health professionals to facilitate diagnosis and treatment of medical conditions." *Cucuras*, 993 F.2d at 1528 (emphasis added).

### B. Table SIRVA Criteria

As noted above, approximately two months prior to the subject vaccinations Petitioner began seeking chiropractic treatment for chronic bilateral shoulder pain – and he was documented to have bilateral tenderness, reduced range of motion, and degenerative joint disease. The prior history alone complicates Petitioner's pursuit of Table SIRVA claim(s), at the very least – and may require their dismissal. *See also* Rule 4(c) Report at 12 – 15 (raising additional arguments regarding significance of the visualized pathology; pain beyond the shoulders; etc.). Thus, the favorable situs finding herein does not overcome all stumbling blocks to entitlement.

### C. Severity

Program compensation is limited to vaccine injuries with "residual effects or complications of such illness, disability, or condition for more than 6 months after the administration of the vaccine." Section 13(a)(1)(A). It is often appropriate to resolve any severity issue first, given that it is a threshold requirement for eligibility under the Program. *Black v. Sec'y of Health & Hum. Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a *prima facie* case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).

In this case, after receiving the flu and hep A vaccines bilaterally on November 19, 2019, Petitioner sought treatment for new acute bilateral shoulder pain promptly (beginning 20 days post-vaccination) and regularly (receiving prescription pain medications, imaging, steroid injections, two PT sessions) up until May 4, 2020. That initial treatment course spanned five and one-half months – and the documentation thereof does not clearly indicate that Petitioner's bilateral shoulder complaints were likely to conclude within just two more weeks. My preliminary assessment is that Petitioner's alleged injuries likely cross the severity "threshold."

Respondent emphasizes the thirteen (13) month treatment gap from May 2020 – June 2021, during which Petitioner did not follow up with his providers via telehealth or refill prescription pain medications (which would be more attractive, given that NSAIDs were contraindicated due to Petitioner's kidney disease). These observations would indicate that any ongoing injury was self-manageable and not significantly disruptive to Petitioner's life – but they do not extinguish a claim on their own. At most, they go to overall severity, which is more relevant to damages calculations.

When Petitioner eventually followed up, *he* again reported a November 2019 onset of bilateral shoulder pain. Ex. 7 at 13. The established orthopedist's exam findings and treatment recommendations appear similar to those at the prior encounters. *Compare* Ex. 5 at 2 – 10; and Ex. 7 – 11. However, the orthopedist did not expressly endorse the onset provided by Petitioner or attribute his ongoing complaints to the vaccinations. Ex. 7 at 1 – 3, 9 – 11. The orthopedist instead noted Petitioner's history of remote shoulder dislocations and recent exercise resulting in biceps soreness. *Id.* at 9, 11. The orthopedist also prescribed PT for "scapular dyskinesis." *Id.* at 11. Thus, Petitioner's *later* complaints and objective findings are less clear based on the existing evidence – and may require a medical opinion, which I am not inclined to authorize while the case remains in SPU.

### Conclusion and Scheduling Order

For the foregoing reasons, it is more likely than not that the hep A vaccine was administered in Petitioner's right arm as alleged. However, his prior history complicates both the Table SIRVA claims and a specific severity finding. These circumstances justify a brief exploration of informal resolution for a reasonable figure. Petitioner should make any necessary adjustments to his demand, and that should be considered by Respondent. If the parties cannot reach a tentative settlement agreement by February 2024, the case will be transferred out of SPU.

**According by no later than <u>Friday, December 01, 2023</u>, Petitioner shall file a joint status report updating me on this case. The status report shall indicate whether Respondent's records requests have been satisfied. The status report shall also update on the parties' efforts to informally resolve this case and proposing their preferred next steps.**

IT IS SO ORDERED.

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master
